UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
UNITED STATES OF AMERICA

                                   Ind. No. 16 CR 540

     -against-

EDWARD MANGANO,
LINDA MANGANO and                   **REPLY MEMORANDUM OF LAW**

               Defendants.
---------------------------------------------------------X

## Preliminary Statement

In January of this year, the Second Circuit Court of Appeals issued its *Silver II* decision, in which it "clarified" and provided a "narrowing gloss" on the "as opportunities arise" theory of *quid-pro-quo* liability. *United States v. Silver*, 948 F.3d 538, 558; 577 (2020). In *Silver*, as in this case, the lower Court and the Government had taken the position that "it is enough that the official promised to perform some or any official acts, for the benefit of the payor, as the opportunities arose." *Id.* at 565. For the first time ever, the Court of Appeals expressly rejected this broad interpretation, holding, instead, that there must be an actual understanding as to the "particular matter or question" upon which the bribe recipient will intervene.

This narrowing gloss had important ramifications in the *Silver* case, because the Government – as in this case – had alleged that *Silver* intervened on multiple, discreet issues over an extended period of time; some, but not all of those interventions had occurred within the statute of limitations. To avoid the statute of limitations issue, the Government had claimed that all of Silver's various acts were part of a single, continuing agreement to intervene "as opportunities arose." But the Court of Appeals held – again, for the first time ever – that this analysis was wrong. Because liability could not be premised upon an open-ended and "non-specific promise to

1

undertake any future matter beneficial to the payor," the Court separately analyzed whether Silver had intervened with respect to *each* distinct "matter or question" within the statute of limitations. The Court held that, where the relevant conduct surrounding a "particular matter or question" occurred outside of the statute of limitation, then such prosecution was time barred.

This Court is faced with the exact same scenario.  Prior to trial, the Government assured this Court that there was no statute of limitations issue, because all of Mangano's alleged actions were undertaken pursuant to "a single as opportunities arose scheme, which ran from January 2010 though February 2015."  11/4/17 Govt. Memorandum of Law at Docket Entry 90, p. 42.  This Court expressly relied upon such theory in order to deny the Defendants' pretrial motion to dismiss the Town of Oyster Bay charges.  In the wake of *Silver II*, it is now clear that the construction which the Government pressed upon this Court was wrong.

In its opposition brief, the Government seeks first to avoid these legal issues altogether, arguing that the Defendant's motion is untimely, and that the Defendant waived his statute of limitations argument by not continuing to raise it throughout the trial.  *See* 5/22/20 Govt. Memorandum of Law at pp. 35-37.  Alternatively, the Government contends that its theory of prosecution comports with the Second Circuit's holding in *Silver II*, under either a "retainer theory" or the "as opportunities arise theory."   Finally, the Government claims that any charging error was harmless under the circumstances.

We address each of these arguments in turn below.

I.      **The Defendant Could Not Have Filed the Instant Motion Any Sooner**

To start, the Government contends that this Court should simply reject the Defendant's motions as untimely.  While the Government acknowledges that the time limits set forth in the

2

Federal Rule of Criminal Procedure may be extended under Rule 45(b) for good cause or excusable neglect, it contends that the Court should not do so in this case.

The standard for determining the existence of excusable neglect was set out in *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership,* 507 U.S. 380, 395, 113 S.Ct. 1489 (1993). *See also Stutson v. United States,* 516 U.S. 193, 116 S.Ct. 600 (1996) (applying same standard in criminal cases). In *Pioneer*, the Supreme Court rejected the more stringent standard that many Circuits had utilized up until that time, which required a party to demonstrate that the period of delay was caused by intervening circumstances beyond the party's control. Instead, the Supreme Court adopted a flexible standard which would permit out-of-time filings even when such delay was caused "by inadvertence, mistake, or carelessness." In doing so, it articulated a non-exclusive list of factors that a district court should consider when determining whether excusable neglect has been established. Those factors include: 1) the reason for the delay, including whether it was within the reasonable control of the moving party; 2) the danger of prejudice to the non-moving party; 3) the length of the delay and its impact on judicial proceedings; and 4) whether the movant acted in good faith. In determining whether a moving party has established excusable neglect, the Supreme Court noted that the "determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Pioneer,* 507 U.S. at 395.

Here, the Government argues there is no excusable neglect, because, it claims, *Silver II* is not "new law" but merely a "clarification" of existing law. As such, it suggests that there is no reason that the Defendant could not have filed such motions earlier.

This is obviously untrue. To focus on whether *Silver II* is "new law" versus a "clarification" of existing law is to place semantics above both substance and common sense. The undisputable bottom line is this – the Defendant *did* file timely motions, raising the statute of limitations issue. Those motions were successfully opposed by the Government based on a now-defunct understanding of the "as opportunities arise" theory of liability. *Silver II* directly addresses the issue that was before the Court, and demonstrates that the Government's understanding was wrong. This was the first time that the Second Circuit has offered such clarification; as such, prior to *Silver II*, there was no legal basis to revisit such issues.

The central holding of *Silver II* is that an illegal, *quid pro quo* arrangement "requires identification of a particular *question or matter* to be influenced. In other words, a public official must do more than promise to take some or any official action beneficial to the payor as the opportunity to do so arises; she must promise to take official action *on a particular question or matter* as the opportunity to influence that same question or matter arises." *Id*. at 552-553 (emphasis in original). "Thus, for an official to promise to perform an official act— and thereby engage in the prohibited *quid pro quo*—the official must promise to act *on* an <u>identified</u> question, matter, cause, suit proceeding, or controversy at the time of the promise." *Id*. at 556, (emphasis added), *citing McDonnell v. United States*, 136 S.Ct. 2355 (2016).

The Court of Appeals described this holding as providing a "narrowing gloss" on the "as opportunities arise" theory of liability. It also noted, however, that such gloss was not inconsistent with its prior holdings – specifically, *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007), which itself required "an anticipated exchange of payment for *particular* kinds of influence." *Silver II*, 948 F.3d at 558 (emphasis in original). In this regard, the *Silver* Court characterized its holding

4

as a "clarification" rather than "a change in the law." *Id.* at 557; *see also* Concurring Opinion at 578.

Regardless of such characterization, it is fair to say that prior to *Silver II*, neither the Government nor this Court understood *Ganim's* use of the word "particular" as limiting, in any meaningful way, the "as opportunities arise" theory of liability. To the contrary, the Government has consistently maintained that all of the different bribery objects – TOB, OEM, and Bread and Rolls – were part of <u>singular</u>, "as opportunities arose" scheme, running through 2015. Hence, the 2017 Indictment alleged:

> In or about and between January 2010 and February 2015, the defendants EDWARD MANGANO and JOHN VENDITTO, together with others, engaged in a scheme to solicit and receive bribes and kickbacks from Co-Conspirator #1 in exchange for EDWARD MANGANO and JOHN VENDITTO performing official actions, on an as needed basis, as opportunities arose, in connection with Co-Conspirators businesses in Nassau County and the TOB, including, but not limited to: (a) the TOB's guarantee of certain loans that certain business entities of Co-Conspirator #1 received from a bank, the identity of which is known to the Grand Jury (the "Bank"), and a private financing company, the identity of which is known to the Grand Jury (the "Lender"), in connection with Co-Conspirator's status as a TOB concessionaire (the "TOB Loan Scheme"); and (b) Nassau County's award of certain contracts to certain business entities of Co-Conspirator #1 (the "Nassau County Contracts Scheme").

Indictment S-1 at ¶ 9.

This charging theory, according to the Government, dispatched with any statute of limitation objections. Hence, when defense counsel argued, pre-trial, that the TOB events occurred outside the statute of limitations, the Government wrote:

> Again, the defendants' motions to dismiss these counts misconstrue the charged scheme. For example, in support of his motion to dismiss, Mangano appears to tie a specific alleged bribe with a specific alleged transaction – that is, L. Mangano's first paycheck with the June 2010 concession amendment between the TOB and Co-Conspirator #1 – and argues that the bribery was allegedly completed in 2010 and therefore outside the statute of limitations. However, Mangano's argument

wholly ignores the fact that the Indictment charges him with a stream of benefits theory of bribery and honest services fraud and the government is not obligated to prove that each payment was in exchange for a specific official action. . .

Both Mangano and Venditto are charged with orchestrating a single "as opportunities arose" scheme, which ran from approximately January 2010 through February 2015.

11/4/17 Govt. Memorandum of Law at Docket Entry 90, p. 42.

Indeed, this Court expressly noted that the Government's "stream of benefits theory" played a "prominent role" in its response to the pretrial motions. *See* 2/9/19 Order at Docket Entry 137, p. 4.  Based upon such theory, the Court reasoned that "convictions for Count 2 and 4 based on the 2010 amendment would not be time barred." *Id*. at 9.  Likewise, with respect to the Defendant's duplicity arguments – which claimed that counts improperly combined distinct allegations relating to Nassau County and the TOB – this Court reasoned: "the allegations in the Indictment allege a single, overarching stream of benefits based conspiracy that included both Venditto and Mangano, and involved them using their respective positions in the TOB and Nassau County to help Singh as needed.  That is sufficient to defeat defendant's duplicity challenge." *Id*. at 12.

In the wake of *Silver II*, it is now clear that the law does not recognize this type of undefined, open-ended agreement to provide help on an "as needed," or "as opportunities arise" basis.  Rather, it requires an agreement that the public official will act with respect to a *particular* matter.

But that is only part of the holding.  As a corollary to its central holding, *Silver II* also provides that the Government may not evade the statute of limitations by charging an otherwise time barred *quid-pro-quo* as part of an ongoing, but otherwise undefined, agreement to provide

6

help on an as-needed basis.  Hence, while the Court of Appeals expressly recognized that Silver's exchange of referrals for grant money *could have* represented a "particular matter" under the "as opportunities arise" theory, such counts were nevertheless reversed because the grants occurred outside the statute of limitations.   The *Silver* Court reached this conclusion *notwithstanding* the fact that referral payments to Silver continued well into the limitations period.

Regardless of whether *Silver II* contravenes prior Second Circuit authority, it is beyond dispute that it is the *first case* to directly address this interplay between the statute of limitations and the "as opportunities arise" theory of liability.  Because its analysis directly contravenes the logic relied upon by the Government and the Court to date, it provides a compelling basis to revisit issues relating to the statute of limitations, sufficiency, and the instructions provided to the jury. In short, *Silver II* represents an entirely new legal basis to challenge the Defendant's conviction – one which literally could not have been brought to this Court's attention any sooner.

Under these circumstances, the balancing of the equities clearly support an extension of the applicable time limits.  In fact, the Government is unable to cite to a single case which would suggest otherwise.

Considering the *Pioneer* factors, it is abundantly clear – first and foremost – that the reason for the delay was not within the reasonable control of the moving party.

Second, the Government has not articulated any way in which it has been unfairly prejudiced by such delay.  Having spent years pushing an advantageous, but now-defunct theory of criminal liability, the Government should not now be heard to complain that it has to address the fallout of *Silver II*.

Nor can the Defendant be faulted for the length of delay or its impact upon the instant proceedings. Indeed, defense counsel brought the instant motion on January 28th – seven days after the issuance *Silver II*. If anything, it is the Government who has largely dragged its feet on this issue. The Court had initially set an opposition due date of February 13th, but on February 5th, the Government wrote to request a 60-day extension and the adjournment of the Defendant's March 19th sentencing date. Thereafter, on April 6th, the Government wrote to request *another* 45-day extension, in order to respond to the Defendant's 11-page motion. While the Defendant's sentencing has been pushed back – *at the Government's request* – in all likelihood, such delay would have occurred regardless, due to the COVID-19 pandemic.

Finally, in light of the above facts, it is clear that defense counsel has acted in good faith and with all possible dispatch. In short, all of the *Pioneer* factors favor the equitable extension of the otherwise applicable time limits.

## II.    The Defendant Did Not Waive His Statute of Limitations Arguments

Alternatively, the Government suggests that the Defendant "waived" "certain aspects" of his statute of limitations argument by not arguing such issue to the jury, by not asking for a jury instruction, and by failing to raise the issue in his oral application to dismiss. 5/22/20 Government Memorandum at p. 36. In support of this contention, the Government cites to *United States v. Grammatikos*, 633 F.2d 1013, 1022 (2d Cir. 1980).

The Government is wrong. After the Court's initial pretrial ruling, defense counsel did not press the statute of limitations issue in the presence of the jury, because any such argument would have been rendered frivolous by the Court's interpretation of the case law surrounding "as opportunities arise" bribery. The Court and the Government contended that the TOB scheme was

8

within the statute of limitations because it was merely one part of a broader, open-ended bribery scheme that continued into 2015.   That *legal* ruling made it impossible for defense counsel to credibly press a statute of limitations argument.

*Grammatikos* does not apply to these facts.  Rather, when the crux of a statute of limitations argument hinges upon an interpretation of the law (as opposed to bare facts), the Court of Appeals has held that the issue is properly preserved by a pretrial motion.  *See United States v. Velbeliunas*, 76 F.3d 1283, 1292 (2d Cir. 1996).

In *Vebeliunas*, the defendant had moved, pretrial, to dismiss on statute of limitations grounds.  The dispute centered on whether the applicable statue of limitations was five or ten years; the Court sided with the Government, finding the applicable statute of limitation to be ten years.  As in this case, the defendant did not request a jury instruction, but did raise the issue in a post-trial motion.  In response, the Government cited to *Grammatikos*, arguing that the issue was waived by the defendant's failure to seek a jury charge.   The Second Circuit explained why the Government was wrong:

> [W]e do not believe that Vebeliunas waived the limitations defense by failing to request a jury instruction on the issue. His limitations argument is premised upon a legal position that he had argued unavailingly to the district court in a pretrial motion. *United States v. Grammatikos,* 633 F.2d 1013, 1022 (2d Cir.1980), upon which the government relies to argue waiver, is distinguishable because the limitations issue in that case was one of fact to be decided by the jury. When, as in this case, the limitations argument is purely an issue of law, there would be no point in requiring a party to seek a jury instruction in the aftermath of an unsuccessful pretrial motion.

*Id*. at 1292.

Thereafter, and based upon this analysis, the Second Circuit went on to consider *both* the legal sufficiency of the evidence and the instructions provided to the jury.  *Id*. at 1292-1293.

9

Because this case falls under the rule described in *Vebeliunas* – not *Grammatikos* – the Defendant's issues are not waived.

**III.  The Government Seeks to Salvage Mangano's Conviction by Relying Upon a New "Retainer Theory" of Liability.  Such Theory Does Not Fit the Facts of the Case, Was Not Charged in the Indictment, and Was Not Explained to the Jury**

Turning to the substantive issues, the Government initially argues that *Silver II* addressed only the "as opportunities arise" theory of liability which was used to prosecute Sheldon Silver.  It suggests that other, alternate theories – such as the "retainer theory" – may still be viable, and that the fact pattern against Mangano could fall within such theory.  As discussed below, there are numerous problems with this argument, not the least of which is that Mangano was not charged under a "retainer" theory, and the jury was not instructed on such a theory.

The Government's argument draws upon footnote 7 of the *Silver II* decision, which noted:

> The terms "as the opportunities arise," "stream of benefits," and "retainer" have been used interchangeably by other courts. *See, e.g., United States v. Percoco,* No. 16-CR-776 (VEC), 2019 WL 493962, at *6 (S.D.N.Y. Feb. 8, 2019); *United States v. Mangano,* No. 16-CR-540 (JMA), 2018 WL 851860, at *2 (E.D.N.Y. Feb. 9, 2018). Our holding is limited to the "as the opportunities arise" theory as set forth in *Ganim—i.e.,* a promise to "exercise particular kinds of influence ... as specific opportunities ar[i]se," 510 F.3d at 144-45. We express no opinion and need not reach the issue of whether the acceptance of a bribe with a promise to perform an official act in the future upon designation of the official act by the bribe payor at that later date (in essence a retainer) would run afoul of the honest services fraud statutes or the Hobbs Act. That case is simply not before us.

The Government suggests that – to the extent that Mangano was placed on retainer, and received continuing payments under such an arrangement, this would solve its statute of limitations problem:

> While Singh did not have to make any additional specific requests to Mangano for the execution of the concession agreement amendments that indirectly guaranteed his loans – for, as discussed above, Mangano pressured TOB officials to take the action they did and the TOB officials complied under Mangano's pressure –

Mangano was nevertheless necessarily "on retainer" in the event that events required Singh to have to go back to the well.  And as the Silver II Court made clear, the fact that Mangano was not required to intervene is of no moment because what matters is that Mangano demonstrated a willingness to do so . . .What matters is that the official manifested a willingness to take payment for official action or inaction . . . Indeed, Singh continued to bribe Mangano in exchange for the promise that Mangano would take any future official action Singh requested to benefit Singh's businesses.

Government Memorandum at p. 41-42.

To begin, it bears pointing out the obvious.  *Silver II* did not actually endorse the "retainer" theory of liability as an alternative means of charging an open-ended agreement.  It merely observed that such theory was not before the Court.  As such – and contrary to the Government's suggestion – the retainer theory has not been endorsed by the Second Circuit, and its validity is frankly unknown at this point.

Second, to the extent that the "retainer theory" is a doctrinally distinct theory of prosecution, the Government did not charge such a theory in this case.  The Indictment does not charge that Mangano was on retainer, nor does it assert that "he accepted a bribe with a promise to perform an official act in the future upon designation of the official act by the bribe payor at that later date."  Rather, it unequivocally charges him under *the same* "as opportunities arise" theory that was used to charge Sheldon Silver.  As the Government's most recent indictment alleged:

In or about and between January 2010 and February 2015, the defendant EDWARD MANGANO, together with others, engaged in a scheme to solicit and receive bribes and kickbacks from Singh in exchange for EDWARD MANGANO performing official actions, or causing the performance of official actions, on an as-needed basis, as opportunities arose, in connection with Singh's businesses in Nassau County and the TOB.

Indictment S-2, ¶ 7 (emphasis added).

11

Likewise, the Court instructed the jury: "To prove a quid pro quo, the Government must prove that the defendant obtained a thing of value in exchange for the promise or performance of official acts <u>as the opportunities arose</u>." TR 4517 (emphasis added). The Court further instructed the jury that: "[i]t is sufficient if the Government proves that the defendant you are considering accepted a thing of value in exchange for the promise or performance of official acts by the defendant <u>on an as needed basis when the opportunity presented itself</u>." TR 4518 (emphasis added).

To the extent that the "retainer theory" requires something different – *i.e.*, an agreement to perform an official act that is to be named by the payor at a later date – the jury was never instructed on such a theory.

Finally, contrary to the Government's suggestion, the facts of the case would not have supported such a theory, even if the Defendant had been so-charged. According to *Silver II*, the defining characteristic of the retainer theory is that the bribe payor buys the right to name a favor of *his choosing* at a later date. *See id*., at p. 558 (Lohier, concurring) (describing retainer as "a bribe to a pubic official in exchange for a future favor, in the form of an official act . . . *that will be identified by the payor* at a later date.") (emphasis added). This is what potentially sets the retainer theory apart from an open-ended as-opportunities-arise theory. Under the former, the bribe payor names the official act to be performed; under the later theory, the bribe recipient exercises his discretion in order to act in a manner favorable to the bribe payor "as opportunities arise."

In its Memorandum, the Government cites to Singh's testimony that he continued to pay Linda Mangano because her husband was "the highest elected official in the County" and "would

12

be effective and helpful with whatever Singh required." Government Memorandum at p. 39. The Government claims that Singh regarded Mangano as a "good investment" who could help with any number of matters, from "the health department, the fire marshals, with town officials, or with anything affecting Singh's business." Govt. Memorandum at p. 39.

To begin with, it is unclear how such testimony was fundamentally different than that provided by Dr. Taub in the Silver case. Dr. Taub, like Singh, continued to make regular payments to Silver even *after* Silver had intervened in the grant matter. "As he explained in a contemporaneous email, 'I will keep giving cases to Shelly because I may need him in the future – he is the most powerful man in New York State." *See Silver II*, 948 F.3d at 561. In essence, the Government is seeking to revive its open-ended "as opportunities arise" theory under a different name.

Moreover, the matters which the Government cites – assistance with fire marshals, the health department, etcetera – were not even charged as official acts. As the Court well knows, there were only three "official acts" charged in the Indictment: TOB, OEM, and Bread Rolls.

The jury, of course, rejected the Government's allegations with respect to OEM and Bread and Rolls. However, even if it had not done so, such matters would *still* not have fit within the model of a "retainer theory."

Again, such theory envisions "a promise to perform an official act in the future *upon designation of the official act by the bribe payor*." *Silver II*, 948 F.3d at 579, fn. 7 (emphasis added). But according to Singh, it was *Mangano* who first suggested that he should get both the Bread and Rolls Contract *and* the OEM Food Procurement Contract. *See* TR 1503. These were *not* matters designated by Singh – rather, accepting the Government's evidence at face value –

13

they were opportunities which Mangano, through his own initiative, purportedly sought to steer in favor of Singh.   *See* TR 1502-1503; 1517-1518; Govt. rebuttal summation at TR 4402-4403 ("Mangano pounced on the opportunity to repay Singh for all those bribes by getting him this extremely lucrative contract.").

In other cases, when Singh *did* explicitly ask Mangano for favors, the evidence established that Mangano *declined* to act, much to Singh's resentment and dismay.  *See* TR 2065 (describing how Neeta Basin could not get contract with County, despite's Singh's attempted intervention); *see also* TR 2082-2083 (Singh unable to secure requirements contracts for SGT).  Hence, the Government did not even put forth evidence consistent with a "retainer" theory – rather, from beginning to end, its case was a classic "as opportunities arise" prosecution.

In summary, the Government cannot salvage the conviction of Edward Mangano by relying upon a footnote in *Silver II*.  To the extent that the "retainer" theory is even valid (a very open question), it would ill-fit the facts alleged in this case.  More importantly, such theory was neither charged in the Indictment, nor presented to the jury in the Court's instructions.

## IV.    To the Extent That the Town of Oyster Bay Loan Guaranty Constitutes a "Particular Matter" Under *Silver II*, Such Matter Occurred Outside the Statute of Limitations

Alternatively, the Government argues that, even under an "as opportunities arise" theory, the TOB events – viewed in isolation – occurred within the statute of limitations.  This argument is based on two assertions.

First, the Government contends that the statute of limitations is satisfied by evidence of continued paychecks to Linda Mangano *after* Mangano's involvement with the TOB loan guaranty.  The Government summarily contends – without citing to a *single* line of trial testimony – that "these biweekly bribe payments to Singh [sic] were regular payments to ensure continued

14

compliance with the scheme, and not merely incidental to a scheme already completed."   Govt. Memorandum at p. 52.   There is a simple reason for the glaring lack of citations: there is literally nothing in the record to support this contention.  To the contrary, as the Government noted in the preceding pages of its own memorandum, Singh testified that such continued payments were made in hopes of obtaining Mangano's assistance on any number of other, hypothetical issues which might come up.  Singh *never* testified that such continued payments represented "back pay" for Mangano's intervention in the TOB matter, or to obtain his future intervention with respect to that same matter.  Notably, the Government makes no effort to address that portion of the *Silver II* decision which rejected this very argument.  *See Silver II*, 948 F.3d at 573 ("the fact that W&L continued to pay Silver after 2010 for legal fees generated on the pre-2007 referrals does not automatically extend the scheme for statute of limitations purposes. Rather, those payments must be made 'in furtherance of' an ongoing scheme, not merely as the *result* of a completed one.").

Which leaves the Government's second argument – *i.e.*, that the TOB scheme continued after October 2011, because two of the TOB concession amendments – "the November 19, 2011 and the June 22, 2012 amendments – occurred within the statute of limitation period."  Govt. Memorandum at p. 56

What the Government fails to mention is that the two referenced amendments – GX 542 and GX 543 – are unrelated to the Madison loans, which occurred as a result of the April 28, 2010 meeting.  During that April 2010 meeting, participants discussed the possibility of two loans – *one* pertaining to Woodlands and *one* pertaining to TOBAY.  At no time did the parties discuss the possibilities of multiple *additional* loans.  The amendments authorizing those two Madison loans – which followed a template created by Rivkin Radler – were executed on June 9, 2010 and May

15

11, 2011 – outside of the limitations period.  *See* GX 536 and GX 541.  Such amendments were authorized by the Town Board, by means of a specific resolution dated June 8, 2010.  *See* GX 535. And that is where Mangano's role ended.

By way of contrast – the documents cited by the Government – GX 542 and GX 543 – relate to the *NDH loans*, which did not occur until over a year later.  The Government introduced *no evidence* that Mangano was even aware of such loans, much less that he exerted official pressure to get them approved.   There was absolutely *no* testimony that Mangano was paid for any role in obtaining such loans, or that he even discussed them with Singh.  To the contrary, Singh himself testified that Edward Mangano had *no involvement* in such loans.

> Q:   About a year after the Madison loan, there would be another amendment to your concession agreement and another loan with the company called NDH, correct?
>
> A:   Yes.
>
> Q:   And there's no Ed Mangano meetings, there's no involvement with Ed Mangano, correct?
>
> A:   No.

TR 2041-2042.

Instead, the evidence established that GX 542 and GX 543 were drafted by Fred Mei, more than 18 months after Mangano's involvement ended, in exchange for a cash bribe of $25,000 in each instance.  TR 1542.  Such amendments were not reviewed or approved by Rivkin Radler, but instead by Harris Beech – Singh's *personal* law firm, which falsely purported to represent the Town of Oyster Bay.  TR 2872.   While the amendments relating to the Madison loans were authorized by the Town Board, the NDH loans were not.  Indeed, such amendments were never even filed in the Town Clerk's office.  TR 2871, 3018.   Rather, they were kept hidden in Fred

Mei's office, and only discovered in 2015. TR 3072. Leonard Genova admitted that the terms of such documents were materially different than those authored by Rivkin Radler, and testified as to his belief that he must have signed such documents without reading them. TR 3048-49. Multiple courts have now found these later-in-time concession amendments to have constituted *ultra vires* acts. *See PHL Variable Ins. Co. v. Town of Oyster Bay*, No. 16CV4013SJFAKT, 2017 WL 2371188 (E.D.N.Y. May 30, 2017); *PHL Variable Ins. Co. v. Town of Oyster Bay,* 929 F.3d 79, 93 (2d Cir. 2019).

In short – and as the Government well knows – Edward Mangano had *no involvement* in such loans, received no payments in connection with them, and never discussed them with either Singh or TOB personnel. In fact, there is simply no evidence in the record that Mangano was even aware of such loans.

## V.     Erroneous Jury Instructions Were Not Harmless

As *Silver II* explains, "a public official must do more than promise to take some or any official action beneficial to the payor as the opportunity to do so arises; she must promise to take official action *on a particular question or matter* as the opportunity to influence that same question or matter arises." *Id*. at 552-553. "The relevant point in time in a *quid pro quo* bribery scheme is the *moment at which the public official accepts the payment.*" *Id*. at 556. Here, the jury was not required to find that Mangano understood – at the time he accepted payment – the particular *question or matter* to be influenced.

The Government contends first, that the failure to so-instruct the jury was ameliorated by the verdict sheet, which required the jury to identify the "particular question or matter" upon which Mangano intervened. Alternatively, they contend that any such charging error was harmless,

because they claim that it is clear, beyond a reasonable doubt, that a rational jury would have found Mangano guilty absent the error.  Govt. Memorandum at pp. 58-59.

The error here was not harmless.  First, as discussed at length above, the open-ended "steam of benefits" instruction allowed the Government to evade the otherwise applicable statue of limitations, which should have precluded prosecution on the TOB matter altogether.

Second, the Court's instruction allowed a jury to convict Mangano based upon the performance of any official act which occurred after Linda was hired, regardless of whether such act was the subject of an agreed-upon *quid pro quo* between Mangano and Singh.  As the Circuit explained:

> An official accepts a bribe, stating to the payor that she will "take official acts as the opportunities arise." In other words, the official has promised to take—as the opportunities arise—"*any* decision or action on any question, matter, cause, suit, proceeding or controversy [that] may at any time be pending," 18 U.S.C. § 201(a)(3) (emphasis added), a promise so vague as to be meaningless. The official has not agreed to take official action on a properly defined—*i.e.,* focused, concrete and specific— question or matter. The official has failed to offer a *quo*. *Absent any additional specificity, criminal liability could attach to any later action the official takes so long as the official is exercising some ability granted to him or her by law, regardless of the fact that the official essentially promised nothing in return for the payment. . .*
>
> *Silver II*, 948 F.3d at 556-558 (emphasis added).

In this case, the jury was not required to find that Mangano understood – at the time he accepted payment – the particular *question or matter* to be influenced.

The failure to so-charge the jury is particularly troubling, given one of the primary defense themes throughout the trial – *i.e.*, that Singh *actually* hired Linda Mangano for purposes entirely unrelated to the Town of Oyster Bay.  Indeed, throughout trial and summation, counsel argued that Singh *actually* hired Linda Mangano with the hope and expectation of obtaining multi-million-

dollar requirement contracts from Nassau County, through his company "SGT." TR 2002-2003; 2082; 4166-4169; 4223.

This, of course, is precisely what Singh told the Government at early proffer sessions. As the Court is aware, Singh registered SGT as a County vendor three days before his company issued its first paycheck to Linda Mangano. TR 2004. But during Mangano's tenure, Singh was never awarded the County Requirements contract, leading Singh to complain that, "had he hired Rob Walker's wife, he would of likely obtained the contract." TR 2003.

Indeed, defense counsel argued throughout the trial that Singh's did not even *need* Mangano's assistance in Oyster Bay, given the Town's long, long history of accommodating Singh's every ask[1] – including an earlier amendment to the Woodlands' concession agreement, which similarly provided the Town's backing of Singh's private loans. TR 1907-1908; *see also* DX 651. Again, this comports with what Singh himself told the Government at early proffer sessions, when he told agents that "if he spoke to JV himself the result would have been the same." 3500-HS-28, pp. 2-3; *see also* TR 2008.

---

[1]     The trial record details the Town of Oyster Bay's nearly boundless accommodation of Singh over two decades. As conceded by Singh, the Town "never said no to him." TR 2006; 2008; 2044. In fact, both Singh and Genova testified that, beginning in 1998, every bid awarded to Singh had been rigged by the TOB to ensure that Singh would win. TR 1884; 2011; 2121; 2562; 2858-60. And, once rigged for Singh, even though many years would remain on each pending agreement, at Singh's request, the TOB repeatedly extended each agreement to eye-popping lengths, effectively ceding ownership of the Town facilities to Singh. By 2014, both the Woodlands and Tappen agreements were 70-year contracts; TOBAY was 60 years. TR 1900-1901; 2917; 3055-3064. Moreover, while both the Woodlands and TOBAY were wildly profitable for Singh, the TOB chose to merely collect rents which were well below-market, rather than a percent of Singh's vast revenues, as permitted under the agreements. Similarly, the Town never collected the considerable late fees owed by Singh, and allowed him to operate while $100,000's in arrears, without default. TR 1886-1887, 2570.

19

Defense counsel's argument – that Mangano was largely incidental to the TOB events – also comports with evidence introduced at trial, including the March 26, 2015 recorded conversation between Fred Mei and Singh.  As the Court will recall, during that recorded conversation Singh told Mei: "They think I have a contract because of Ed."  Fred Mei – who was working with the Government – responded, perplexed: "A contract with the town?"  After pregnant pause, Fred Mei – Singh's inside guy at the town – muttered, "Well, that's not true.  *Well, I know that's not true*."  TR 2134-2138; *see also* GX 210.

And finally, it comports with what Singh has been saying *since* the trial, in sworn deposition testimony, where he has testified that alleged bribes to Mr. Mangano related to Nassau County, and "*had nothing to do with the Town of Oyster Bay*."  *See* Defendant's Rule 33 Motion, based upon newly discovered evidence, at Docket Entry 419.

*Silver II* speaks directly to this defense.  If Singh conveyed a benefit, with the hope and expectation that Mangano would act with respect to a particular question or matter (*i.e*., SGT), a *properly* charged jury could not have convicted, merely because it found that Mangano later took some incidental action with respect to an unrelated matter (*i.e*., TOB).  Indeed, this is precisely the type of overreach which *Silver II* sought to foreclose.  As the *Silver* court warned:

> without a requirement that an official must promise to influence a particular question or matter, any official who accepts a thing of value and then later acts to the benefit of the donor, in any manner, could be vulnerable to criminal prosecution.

*Silver II*, 948 F.3d at 556-558.

Unfortunately, the jury here was not made aware of such requirement.   Under the Court's instruction, the jury was not required to find that a bribe was paid and accepted, pursuant to an understanding that Mangano would act with respect to any specific or particular matter.  As the

20

prosecution was able to tell the jury in summation: "It's sufficient that Ed Mangano accepted something of value in exchange for the performance of an official act on an as-needed basis as the opportunity arose."  TR 3737.

Under these circumstances, and given the weakness of the Government's case in general – a case which necessitated two trials, and resulted in multiple counts of acquittal – we respectfully submit that this is simply not a situation where the Court can conclude – *beyond a reasonable doubt* – that a rational jury would have found Mangano guilty absent the charging error.  *United States v. Bah,* 574 F.3d 106, 114 (2d Cir. 2009).

## CONCLUSION

For the reasons set forth herein and in our original moving papers, the Defendant Edward Mangano respectfully moves for reconsideration of his prior motion to dismiss on statute of limitation grounds.  Alternatively, Defendant moves for a judgment of acquittal, and/or a new trial pursuant to FRCP Rule 33.

Dated: Garden City, New York
      June 5, 2020

              Respectfully submitted,

          By: /s/  Kevin J. Keating
              Kevin J. Keating, Esq.
              Matthew W. Brissenden, Esq.
              *Counsel for Edward Mangano*
              666 Old Country Road, Suite 901
              Garden City, New York 11530
              (516) 222-1099