UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA

      -against-

EDWARD MANGANO,
LINDA MANGANO and

              Defendants.
--------------------------------------------------------X

Ind. No. 16 CR 540

**REPLY MEMORANDUM IN
SUPPORT OF DEFENDANT'S
MOTION FOR A NEW TRIAL
PURSUANT TO FRCP RULE 33**

## <u>PRELIMINARY STATEMENT</u>

In their opposition brief, the Government strives to somehow harmonize Harendra Singh's recent deposition testimony with his trial testimony, repeatedly suggesting that he may have simply been confused during his most recent testimony.  Alternatively, the Government contends that, if Singh *did* lie about his reasons for hiring Linda Mangano, and Edward Mangano's role in the Town of Oyster Bay "loan scheme," such lies would merely constitute "cumulative" impeachment material.  Finally, the Government contends that, in any event, such lies are "immaterial" because Edward Mangano's conviction on the TOB matter was supported by purportedly "overwhelming" evidence from other sources.

As set forth herein, the Government is wrong.

There is no reconciling Singh's deposition testimony with his trial testimony, and the lies revealed therein are not "immaterial" or "cumulative" – rather, they go the very heart of the surviving allegation against Edward Mangano.  Finally, the notion that the TOB allegations – which were in many ways the most strained and incredible allegations of the entire indictment – were supported by "overwhelming" evidence independent of Singh's perjury is transparently false.

1

I.      **THE GOVERNMENT MISSTATES THE APPLICABLE LEGAL STANDARD**

The Government's discussion of the "applicable law" is based almost entirely upon a line of cases which is simply inapposite to the present circumstances.  In particular, the Government repeatedly cites to *United States v. Sanchez*, 969 F.2d 1409 (2d Cir. 1992), *United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000), *United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001), *United States v. Bell*, 584 F.3d 478 (2d Cir. 2009), *United States v. McCourty*, 562 F.3d 458 (2d Cir. 2009) and *United States v. Josephberg*, 562 F.3d 478 (2d Cir. 2009).  According to the Government, this line of authority holds that a District Court should not "usurp the jury's role" or "intrude upon the jury function of credibility assessment."  Govt. Brief at p. 24.  Relying upon the above cases, the Government contends that this Court may not order a new trial unless it finds Harendra Singh's trial testimony to be "patently incredible."  *Id*. at 24, 31.

But none of these cases involve newly discovered evidence.  Rather, in each case, the defendant moved for a new trial based *solely* upon the weight of the evidence adduced at trial.  In each case, the Defendant asserted that such trial evidence – while legally sufficient – nevertheless warranted a new trial, due to issues of witness credibility.  In essence, these are cases where the defendant asked the trial court to serve as a "13[th] juror," in order to override the credibility assessment of the jury, without reference to newly discovered evidence.  As explained by Chief Judge Walker in his concurring *Ferguson* opinion, this is a remarkable and rarely granted remedy:

> Like many legal metaphors, the "thirteenth juror" analogy lacks precision. It fails to convey the considerable circumspection that this court has required of district courts' decisions on Rule 33 motions based on the weight of the evidence. "It has long been our rule that trial courts 'must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses.' It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Sanchez,* 969 F.2d at 1414 (quoting *United States v. LeRoy,* 687 F.2d 610, 616 (2d Cir.1982)). As long as the evidence is

sufficient to let the jury decide the question, the district court may not supplant the jury's finding of no reasonable doubt with its own finding that reasonable doubt exists. Rather, a new trial should be granted "only in exceptional cases in which the evidence preponderates heavily against the verdict," 3 Wright, *supra*, § 553, at 248, such that the only rational outcome is acquittal. There must be a real concern that an innocent person may have been convicted.

*United States v. Ferguson*, 246 F.3d 129, 139 (2d Cir. 2001).

When a defendant makes this type of application – based solely upon the "weight of the evidence" adduced at trial, the Defendant must demonstrate "exceptional circumstances" – *i.e.*, that the testimony offered at trial "was patently incredible or defied physical realities . . ." *United States v. McCourty*, 562 F.3d 458, 476 (2d Cir. 2009), *citing United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).

The Defendant here is not asking for a new trial based upon the "weight of the evidence" adduced at trial.  Rather, the Defendant's motion is based upon *newly discovered evidence* of trial perjury.  As such, the applicable standard is not dictated by *Sanchez*, *McCourty, Ferguson, Autuori*, *Bell*, or *Josephberg*; contrary to the Government's suggestion, the Defendant is not obligated to show that Singh's trial testimony was "patently incredible" on its face.

Rather, the controlling law is that cited in the Defendant's original moving papers:  *United States v. Monteleone*, 257 F.3d 210 (2d Cir. 2001) and *United States v. Wallach,* 935 F.2d 445 (2d Cir.1991).  *See Monteleone*, 257 F.3d at 219 (discussing appliable standard "to grant a new trial based on newly discovered evidence of trial perjury"); *see also United States v. Wong*, 78 F.3d 73, 81 (2d Cir. 1996) (applying *Wallach* standard where "newly discovered evidence indicates that testimony given at trial was perjured."); *United States v. Bout*, 144 F.Supp.3d 477, 484 (S.D.N.Y. 2015) (same); *United States v. Teman*, No. 19-CR-696 (PAE), 2020 WL 3034034, at *47 (S.D.N.Y. June 5, 2020) (same).

3

Consistent with that authority, the questions before the Court are as follows: (1) whether newly discovered evidence demonstrates that Singh perjured himself at trial; (2) whether the Government knew or should have known that such testimony was perjured; (3) and whether Singh's perjured testimony was "material."  With respect to this last prong – if the Government knew or should have known that such testimony was false, then a new trial is warranted if there is *any* reasonable likelihood that such false testimony could have affected the judgment of the jury. Otherwise, the question is whether the Court is left with a firm belief that, *but for* such perjured testimony, the Defendant most likely would not have been convicted.  *See Wallach*, 935 F.2d at 457.

## II.   THE GOVERNMENT'S EFFORTS TO RECONCILE SINGH'S DEPOSITION AND TRIAL TESTIMONY ARE UNAVAILING

The Government asserts, first and foremost, that there is simply no tension between their cooperator's trial testimony and his post-trial deposition testimony.  To reach this conclusion, prosecutors engage in a series of logical and linguistic contortions so strained as to border upon the absurd.

In his deposition testimony, Harendra Singh reiterated at least *three times* that bribes to Mangano were unrelated to Town business or concession amendments.

Q.   In terms of the bribery of the town officials, does that relate to S.R.B. Convention and Catering Corp.?

A.   What do you mean relate to?

Q.   Does it have anything to do with S.R.B. Convention and Catering Corp.?

A.   The person who was charged that I bribe him was found not guilty, the town supervisor, John Venditto. So, I don't know about a bribe.

Q.   What about Ed Mangano?

4

A.       Ed Mangano is not Town of Oyster Bay. He is Nassau County.

Q.       Wasn't that part of the allegation that you paid bribes to him to gain advantage for The Woodlands, the S.R.B. Convention and Catering Corp.?

A.       That's up to the judge and court. That's not me. It is the county. It had nothing to do with the Town of Oyster Bay.

Q.       Didn't you plead guilty to bribing Mr. Mangano?

A.       Yes. I did.

Q.       Why did you plead guilty to bribing him?

A.       I pled guilty that his wife had a job. You can see in the transcript what I pled guilty and what I said.

Q.       Yes, but I am asking you, did pleading guilty relate to S.R.B. Convention and Catering Corp.?

A.       I do not believe so.

Having committed themselves to the task of reconciling the unreconcilable, prosecutors offer up a series of explanations as to what Singh might have *really* meant to say.

First, the Government repeatedly suggests that Mr. Singh was simply confused, and might have believed that the deposition questions related to some *other* TOB concession amendments. In support of this contention, the Government cites to the following exchange:

Q.       In terms of the concession agreement with the Town of Oyster Bay and S.R.B. Convention and Catering Corp., did you bribe any town official to get any amendment to that concession agreement?

A.       No.  I did not.  I asked them to extend it, and they did. I was working for a very long time at the town facility and doing a good job.

*See* Govt. Memorandum of Law at p. 28, citing to Ex. A at 203.

5

Hence, the suggestion here is that, *perhaps,* Singh *thought* he was being questioned about the initial concession award, or amendments extending his concession agreements, as opposed to the amendments guarantying his debts.  *See* Govt. Memorandum of Law at p. 31 ("a reasonable interpretation for this question could be whether Singh bribed Mangano to assist him in obtaining the initial concession agreement for SRB Convention and Catering Corp. or the subsequent extensions of those agreements.").

This suggestion is utterly belied by the very specific questions posed prior to this exchange, as well as the *very next lines* of the deposition testimony, which the Government has decided to omit:

> Q.    I am not talking about the amendments that extended it.  I am talking specifically about the amendments where it was alleged that the Town of Oyster Bay guarantees or purported to guarantee the N.D.H. loan.  Do you recall that?
>
> A.    Well, you can read my transcript what I pled guilty or didn't plead guilty to or who I bribed and didn't bribe.
>
> Q.    I am trying to get some more detail on that.
>
> A.    That is the detail I am going tell you as of right now.
>
> * * *
>
> Q.    With respect to the 2011 amendment of the S.R.B. Convention and Catering Corp., concession agreement wherein the town guaranteed the loan, the N.D.H. loan, did you bribe any town official to obtain that amendment?
>
> MR. BERMAN: You asked that, and he said no.
>
> MR. ABRAMI: I believe there was some color to that.
>
> MR. BERMAN: No. There was no color to that. He answered no.
>
> Q.    Was that your answer?

A.      Yes. I said that before.

Q.      So, you did not bribe a town official to get an amendment to the 2001 concession agreement?

A.      As I said, I did nice things for a lot of people in the town. Did I particularly bribe somebody for S.R.B. Concession?  No.

*Id*. at 203-207.

Likewise, before this exchange even occurred, Singh was expressly asked about "the whole Town of Oyster Bay <u>loan scheme</u>" (8/5/19 Dep. Tr. at p. 192) (emphasis added), and whether he "bribe[d] anyone in the Town of Oyster Bay to get the town to back the loan."  *Id*. at 196.  It is perfectly evident from the record that Mr. Singh was not confused about what was being asked of him.  The transcript clearly demonstrates that Singh understood that he was being questioned about the concession amendments which are at the heart of this case.

Alternatively, the Government poses another, equally ludicrous, hypothetical explanation for Singh's deposition testimony.  According to the Government, "Singh's answer that he did not believe that his guilty plea related to S.R.B. Convention could reasonably be interpreted to mean that his guilty plea related to more than just S.R.B. Convention."   Govt. Memorandum at p. 30.

It is unclear *how*, exactly, this would be a "reasonable interpretation."  Singh was not asked whether the bribery of Ed Mangano related *only* to S.R.B. Convention.  To the contrary, he was expressly asked if his crimes of conviction had "*anything to do* with S.R.B. Convention and Catering Corporation."  Likewise, with respect to Ed Mangano, he was explicitly asked whether "*part of* the allegation" involved bribery to gain advantage for SRB Convention and Catering Corp. In response, Singh flatly denied that his plea "relate[d] to SRB Convention and Catering Corp."

7

All of this leads to a final point. Throughout this case, there have been documented instances where Singh committed perjury as to material matters. Indeed, Singh's acts of perjury were so pervasive, transparent, and unrepairable that, after three days of cross-examination, the *Government asked not a single question of their witness on redirect*. His many material lies stood bare, with no effort made to salvage the unsalvageable. And, yet, here the Government – seemingly without irony – cites to Singh's "truthful trial testimony." *See* Government Memorandum at p. 27. Singh's acts of perjury were countless, and could fill these pages. At trial, his perjury infused all aspects of this testimony, including the OEM/Singletons and Bread and Rolls allegations; his own dizzying acts of criminality, and his various shifting claims of providing things of value to Mangano. Below is a small sampling:

- In both Mangano I and II, in an apparent effort to put Singleton's on equal footing with Butch Yamali's South Shore restaurants (which lost power for days), Singh repeatedly testified that Singleton's was totally without power for days following Hurricane Sandy. TR 2192, 2202, 2203. Under cross-examination, Singh's testimony concerning the length of such power outage would vary when confronted with evidence that (1) Singh, early on, was voluntarily providing food from Singleton's to O.E.M. (TR 2204) and (2) that people were in fact dining at Singletons. TR 2206-2207. Despite this, Singh held firm – steadfastly maintaining that Singleton's had no power for days – all in an apparent effort to fit the Government's narrative that the emergency food procurement should have gone to a South Shore restaurant in the flood zone. It was not until the cross-examination of Singh's manager, Dave Saloney, *in Mangano II*, that it was all revealed to be a complete lie: Singh's kitchen at Singleton's, in fact, *never lost power*, a fact which was known by prosecutors, as Saloney had proffered such information to the Government long before trial. TR 3488-89.

- In Mangano I and II, Singh offered that, after Mangano tasted a cookie from Singh's storefront bakery, Mangano commented that he would have to get Singh the large-scale commercial contract to supply bread to the County Jail. TR 1503, 2128. As such, Singh repeatedly (and incredibly) testified that he met with the sheriff "perhaps 25 times," solely to discuss the Bread bid, such that Singh would come to know "everything about the bid." TR 2129. Of course, this testimony was patently false. In fact, *two days* after the County released the bid on its website, Singh sought help in an email to a friend, as he didn't even know how to access the County bid. TR 2154-2155. When confronted with this email, Singh compounded his perjury by falsely stating that

"it was a different food bid." TR 2155. And, despite knowing "everything about the bid" stemming from his countless meetings devoted to the topic, it wasn't until *after* it was awarded that Singh realized his small bakery was utterly incapable of fulfilling the terms. TR 2149.

- In Mangano I and II, Singh unequivocally testified that among the things of value provided to Mangano was reduced rent for his campaign office, located at a strip mall owned by Singh's parents. TR 1964. In support, Singh pointed to a series of purported leases with the Bethpage Republican Club as evidence of the rent reduction. TR 1983. This, too was proven to be a lie. Unequivocal internal emails between Singh and his staff revealed this testimony to be a hoax, as each of these leases had been forged by Singh to fabricate his rent rolls, in furtherance of a scheme to commit bank fraud. TR 1967.[1] Moreover, it was established at trial that only the "Friends of Ed Mangano" had authority to lease a campaign office, not the "Bethpage Republican Club." And, it was irrefutably established that the signatures on each of the "Bethpage Republican Club" leases introduced by the Government were forgeries. TR 1554, 1983-85.

- In Mangano I and II, Singh pointed to his gift of a massage chair to Mangano as a bribe, as evidenced by the attached note which read "Happy Birthday," even though it was not Mangano's birthday. Singh told the jury that his note was "code for bribe." TR 1667; 2069-2070. On cross examination, it was revealed that, at that exact time, Singh's Water's Edge Restaurant hosted a "50th Birthday Fundraiser for Ed Mangano" which was attended by many influential members of the Indian community. TR 2073. Faced with this, Singh doubled down on his perjury, bizarrely offering that "I had nothing to do with that event." TR 2071. His perjury became even more transparent when Singh was confronted with Water's Edge invoices which repeatedly noted that various choices for the affair had been chosen "as per H." TR 2072.

Otherwise, Singh repeatedly lied about owning multiple properties in Goa, India (TR 2232-2238) and his wife's withdrawal of cash from his businesses. Singh employees proffered to the Government that Ruby Singh was known as "the Bank of India," due to he her weekly practice of removing of tens of thousands of dollars from the Singletons' safe. *See also* TR 340. Yet, when

---

[1]     Again, government prosecutors were placed on notice of such perjury, as: (1) they possessed the documents showing the creation of fake rent rolls; (2) witnesses had told them that Singh used fabricated leases to obtain loans; and (3) defense counsel expressly brought all of this information to their attention prior to the second trial. That did not prevent prosecutors from eliciting such testimony a second time around.

confronted with emails reflecting his wife's removal of such cash, Singh repeatedly lied by claiming that his wife merely doing "payroll."[2]  TR 2087-92.  And, in a particularly stunning moment, when confronted with surveillance photos, depicting Singh exiting his home carrying his cell phone (in violation of his bail conditions), in the company of an individual who was awaiting sentencing following his plea of guilty in a federal mortgage fraud scheme, Singh alternatively claimed  that such individual had come to Singh for help with a "lawful" loan modification and/or that Singh was bringing him to see his own criminal defense lawyer -- even though Singh claimed to know nothing about his criminal case.  TR 2145-2146.

After the first trial, many of these matters were brought to the Government's attention with the hope and belief that Mr. Singh would be held to account for instances of trial perjury – or at the very least, that such perjurious testimony would not be offered at the second trial.  But time and again, the Government has chosen instead to provide cover for Mr. Singh, denying the obvious, while continuing to put forth testimony which they know or should know to be fundamentally unreliable.  In clinging to their cooperator at all costs, the Government has demonstrated an unfortunate willingness to place expedience over integrity.

This latest round of litigation is yet another chapter in this disheartening trend.  Singh has now provided sworn testimony which is diametrically opposed to his trial testimony regarding the TOB – the last remaining allegation in the purported fraud scheme.  And yet, the Government does not appear to take this development seriously; instead, it offers up to the Court a series of half-

---

[2]      Of course, the Government had already called Singh's payroll employee who testified as to how employees were paid (TR 290-374); suffice it to say, Ruby Singh had nothing to do with payroll.

hearted hypotheticals, about how he *could have been* confused, and what he *might have* "meant" to say.

There is frankly no reason for us to speculate on these issues. We believe that Singh's deposition testimony is sufficient on its face to set aside the verdict, consistent with the Circuit's controlling authority as set forth in *Monteleone*, *Wallach,* and *Wong, supra.* In the alternative, rather than relying upon the Government's creative musings as to what Mr. Singh *could have* meant, the Court should, at a bare minimum, order a hearing so that we can hear directly from Mr. Singh – notwithstanding the fact that any such testimony is likely to result in the continued slaughter of the oath. In the event that this Court finds a hearing to be necessary, the Government should be ordered to have no indirect or direct contact with Mr. Singh in the lead-up to such hearing.

## III.   NEWLY DISCOVERED EVIDENCE OF PERJURY IS MATERIAL

Sworn post-trial testimony from Harendra Singh that his purported bribes to Edward Mangano "had nothing to do with the Town of Oyster Bay" is material under any conceivable standard. Indeed, given the current posture of the case, the post-trial clarification of law brought about by *Silver II*, and the jury's limited verdict, it is hard to imagine anything more material.

The Government seeks to diffuse this obvious point with a variety of arguments. Among other things, the Government seeks to characterize Singh's post-trial deposition testimony as impeachment evidence which is merely cumulative to other material that was already available to defense counsel. They argue that the majority of the deposition testimony actually pertains to Venditto – not Mangano. And finally, the Government argues that in any event, the TOB

allegations were supported by "overwhelming evidence" which came from sources independent of Singh.  We consider each of these arguments in turn below.

## A.  Singh's Deposition Testimony is Not "Cumulative" Impeachment Material

The Government cites to a series of cases, all of which stand for the proposition that new information which "is merely cumulative of equally impeaching evidence introduced at trial, so that it would not have materially increased the jury's likelihood of discrediting the witness, is not material."  Govt. Memorandum at p. 26, *citing United States v. Reyes*, 49 F.3d 63, 68 (2d Cir. 1995), *United States v. Spinelli*, 551 F.3d 159, 165 (2d Cir. 2008), *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996), *United States v. Avellino*, 136 F.3d 249, 256 (2d Cir. 1998); see also Govt. Memorandum at p. 33, *citing Mesarosh v. United States*, 352 U.S. 1, 9 (1956), *United States v. Gilbert*, 668 F.2d 94 (2d Cir. 1981).

However, a quick perusal of the above-cited cases shows that they are not even remotely analogous to the instant situation.  Rather, each of these cases involved situations where, post-trial, information came to light indicating that a Government witnesses had committed some unrelated crime, which was undisclosed at the time of trial.  In almost all of these cases, the Second Circuit found that such additional, impeaching material was unlikely to have affected the outcome of the trial, where such witnesses had already admitted to numerous other criminal acts at trial.  *See United States v. Spinelli*, 551 F.3d at 165 (new evidence that witness was involved in additional, undisclosed criminal activity was immaterial where had already learned of witness's "extensive criminal history"); *United v. Avellino*, 136 F.3d at 258 (newly discovered evidence that witness had committed perjury in other trials was not material, where same witness had "already admitted his involvement in  . . . murder, high-jacking, burglary, arson, gambling . . . counterfeiting,

loansharking, extortion, labor racketeering . . . threats, assaults . . .”); *United States v. Gilbert*, 668 F.2d at 96 (newly discovered evidence showing that witness engaged in fraudulent business activities was unlikely to have changed outcome of trial, where same witness had already admitted to market manipulation and perjury in an unrelated matter); *United States v. Wong*, 78 F.3d 79-80 (newly disclosed transcripts showing that witness failed to file tax returns was cumulative of other evidence introduced to show witness's "mendacity, interest and bias"); *United States v. Reyes*, 49. F.3d 68 (revelation that DEA agent had lied in later cases did not warrant new trial, where such evidence did not refute agent's trial testimony, and where such testimony was of only marginal importance); *Mesarosh v. United States*, 352 at 9 (observing – *in dicta* – that evidence of subsequent perjury by a Government witness in an unrelated matter would not ordinarily support motion for a new trial.).

The facts before this Court are very different.  Indeed, if defense counsel had merely learned, post-trial, of some additional fraudulent act by Singh, we would not have even bothered to file this motion.

Instead, this Court is confronted with a very different type of newly discovered evidence – sworn testimony wherein Singh contradicts himself with respect to the central allegation underlying Mangano's conviction – *i.e.*, that benefits to the Mangano's were paid as a *quid pro quo* to secure Mangano's intervention in the Town of Oyster Bay.  The Government is unable to cite to *any* analogous case which holds that this type of newly discovered evidence is immaterial. *Compare*, *United States v. Badalemente*, 507 F.2d 12 (2d Cir. 1974) (holding that undisclosed letters from cooperating witness, accusing prosecutors of undue pressure and coercion, were material and required new trial).

13

Finally, the Government contends that "[a]t best, Singh's deposition testimony is duplicative of previously available material provided to the defense counsel in advance of trial." Govt Memorandum at p. 27.  Prosecutors are conspicuously vague here, but presumably they are referring to statements made by Singh at his early proffer sessions, and during recorded conversations, which likewise contradict the Government's trial narrative on TOB.

But there is a world of difference between statements made by a witness *before* entering into his cooperation agreement, and statements made *after* he has entered into such an agreement. First, such pre-trial statements were not made under oath.  Moreover, the Government could argue that such statements were self-serving falsehoods, uttered at a time before the witness had "accepted responsibility."   Indeed, the Government made precisely this argument in its closing statement:

> How about this recording with Fred Mei that defense counsel harped on, says that the recording shows that Singh is lying now, that he made the whole thing up to satisfy the government.  He says that because years ago, when Singh was knee deep in bribery and fraud investigations, the fact that he didn't admit it means that he must not have done anything wrong.
>
> Think about that for a second.  At a time, at the time when Singh is talking to Mei, Singh is in the middle of a massive bribery scheme, he's been bribing so many people and committing all kinds of crimes and fraud and he's trying to keep it, keep it from the FBI.  Do you think he's going to admit anything to anyone?  Come on. How does a fish get caught?  He opens his mouth.
>
> At the time Mr. Singh was not about to volunteer to anyone that Ed Mangano, or any politician were getting bribed by him, or using their official position.  Think about it.  If Singh told Mei or anyone else that he was bribing Mangano and Venditto and Genova, what would he be doing?  He would be creating a witness for us to use to prosecute him.  Today's friend is tomorrow's government witness. Just ask the Manganos.  Singh was not about to admit the things that could be used against him later.
>
> TR 4456-57.

14

No such explanation exists for Singh's post-trial deposition testimony.  The fact that Singh has now testified, under oath, that Mangano had nothing to do with the Town of Oyster Bay utterly devastates his credibility with respect to the single most important issue at trial.  The fact that he has previously made similar statements does not weaken, but rather strengthens the imperative for a new trial.

**B.      Even the Testimony Relating to John Venditto is Exculpatory Evidence**

The Government also suggests that the deposition is immaterial to the extent that "the questions posed focus almost exclusively on Singh's interactions with the TOB officials, not Mangano."  Govt. Memorandum at p. 28.  But this is a mischaracterization of the evidence.  At the very outset, Singh was expressly asked whether bribes to Edward Mangano were paid to gain advantage for S.R.B. Convention and Catering Corp.  Singh responded that Mangano was "not Town of Oyster Bay" and that the payments to him "had nothing to do with the Town of Oyster Bay."  Singh's unequivocal response left little in the way for follow-up questions concerning Mangano.  Accordingly, the questioner thereafter focused upon Singh's interactions with Town officials.

Moreover, Singh's response to such questions – while more nuanced – are nevertheless material and exculpatory, in light of *Silver II.*  In essence, Singh testified that there was no *quid pro quo* understanding that the Town Supervisor would act on any *particular* matter.

> Q.    As far as what you pled guilty to, not what the court found you guilty or not guilty of, did you pleading guilty to bribing Mr. Venditto have to do with S.R.B. Convention and Catering Corp.?
>
> A.    I don't recall.  I do not believe so.
>
> Q.    You don't recall the whole Town of Oyster Bay loan scheme?

A.       Yes.  The alleged loans taken from the Town of Oyster Bay.

Q.       Right.  That had to do with S.R.B. Convention and Catering Corp., didn't it?

A.       It had to do with two facilities, S.R.B. Convention and S.R.B. Concession.

Q.       S.R.B. Concession, Inc., that was for Tobay Beach, correct?

A.       Correct.

Q.       What I am getting at is that you pled guilty to bribing Mr. Venditto, and that has some relationship to S.R.B. Convention and Catering Corp. at The Woodlands, correct?

A.       I do not know what was the exact charges to Mr. Venditto directly related to S.R.B.  My pleadings were general things which I did for Mr. Venditto. I do not believe it was, oh, in particular you did this.  I do not believe that.

Q.       Not specific conduct.  I understand what you are saying. You mean like you didn't say I gave him such and such for S.R.B. Convention and Catering Corp. if that is what I am understanding.

Q.       It was more general, correct?

A.       Yes. I did things for him, whatever he needed.  Yes.

Q.       The loan that we referred to earlier, the N.D.H. loan that we referred to[.]

A.       Yes.

Q.       Was that part of the Town of Oyster Bay loan scheme?

A.       That was a loan legitimately taken from N.D.H., signed by town officials, and given the loan to S.R.B., correct.

Q.       You are saying legitimately, but did you bribe town officials to get them to help you get that loan?

A.       No. I didn't particularly bribe somebody, say, hey, do this loan. I had done certain things for them.  Later on which was found not guilty of Mr. Venditto.

Q.       Are you testifying here today that you did not bribe Mr. Venditto?

16

A.     I didn't say that.

* * *

Q.     I asked, I think, before the objection was raised, that are you saying that you that you did not bribe anyone in the Town of Oyster Bay to get the town to back the loan?

* * *

Q.     Okay. So, you had favors out.  That meant people owed you something. Is that what that means?

Q.     I want to know what you meant.

A.     I did nice things for people, you know, and they did nice things for me.  It was no particular S.R.B. loan. No.  It wasn't one particular thing.  No.

If *Silver II* were the established law pre-indictment, it is doubtful that the Government would have ever brought an indictment against Mr. Venditto.  As *Silver II* explains, "a public official must do more than promise to take some or any official action beneficial to the payor as the opportunity to do so arises; she must promise to take official action *on a particular question or matter* as the opportunity to influence that same question or matter arises."  *Id*. at 552-553.  "The relevant point in time in a *quid pro quo* bribery scheme is the *moment at which the public official accepts the payment.*"  *Id*. at 556.

What could this possibility mean with respect to Mr. Venditto?  That he agreed to intervene with respect to the loan issue at the moment he was enjoying free pasta in the basement of Singletons?  The potential case against Mr. Venditto, which was always thin, has been rendered absurd in the wake of *Silver II*.  As Singh made clear in his deposition testimony, there was a history of "nice" treatment between Singh and Venditto, but there was no *quid-pro-quo* understanding that Venditto would intervene as to any *particular matter*.

17

I did nice things for people, you know, and they did nice things for me.  It was no particular S.R.B. loan. No.  It wasn't one particular thing.  No.

While the above discussion may seem academic as it relates to Mangano, in reality, it is anything but.  Because the Federal Program Bribery statute only applies to an agent of the affected Government, and because Edward Mangano was not an agent of the Town of Oyster Bay, any potential liability under such counts hinged upon a finding that *Venditto* was bribed, and that Mangano somehow assisted such conduct.  *See* TR 3675-3676; TR 4378.  As such, deposition testimony which exonerates Venditto in this regard would necessarily negate Mangano's liability for the TOB matter under Counts 1 and 2.

## C.   In the Absence of Singh's Testimony, it Cannot Be Said that the Verdict Was Supported by Overwhelming Evidence

Finally, the Government argues that a reasonable jury would be unaffected by the knowledge of Singh's post-trial deposition testimony, because the verdict with respect to the TOB allegation was supported by "overwhelming," independent evidence.

The Government then goes on to exhaustively catalog such "evidence," devoting pages of their brief to describing evidence of matters that were never even at issue.  As the Court well knows, the question before the jury was never whether the Manganos received things of value; Singh's self-serving largesse with the Manganos was never in dispute.  Nor was there any question as to whether Mangano attended the April 28, 2010 meeting, at which Singh's loan situation was debated.

The ultimate issues before the jury were related, more than anything, to questions of Mangano's intent – (a) whether Mangano supported Singh's efforts in the Town as a favor for a friend of 25 years, or whether his actions were undertaken as part of a corrupt, *quid-pro-quo*

18

agreement; and (b) whether such support rose to the level of an "official act" under *McDonnell v. United States*, 136 S.Ct. 2355 (2016).  As the Court is aware, "merely setting up a meeting, hosting an event, or calling another official" or "simply expressing support for an idea" does not qualify as an "official act."  *Id.* at 3259.

As such, the real questions are whether – in the absence of Singh's tainted testimony – there is *overwhelming evidence that*: (a) Mangano was not merely attending a meeting or expressing support, but that he engaged in formal government action under *McDonnell*; and (b) Mangano understood that his actions with regard to the Town were undertaken in exchange for things of value, and not based upon a 25-year history of friendship with Singh.

As set forth below, the testimony of Genova, Sinnreich, and Savino – even at face value – failed to establish these elements, and certainly did not do so by *overwhelming evidence*.  A cursory inspection of their testimony reveals the evidence of guilt in the TOB matter to be less than thin.

*1. TOB Background*

In 2010, Ed Mangano was elected County Executive of Nassau County by 300 votes.  TR 1938, 2958.  At that time, John Venditto had been the Supervisor of the Town of Oyster Bay for 12 years (TR 1842) and had been functioning as the *de facto* Supervisor since 1992.  TR 2862-63.  Venditto was assisted by his long-time Deputy Supervisor Len Genova for nearly 20 years (TR 1852, 2748-49, 2861), while Deputy Town Attorney Fred Mei would likewise serve under Venditto for nearly two decades.  TR 1369, 1754.  As Supervisor, Venditto would also serve on the Town Board, which would vote unanimously with Venditto on every vote for nearly two decades.  TR 1844, 2579, 2956, 2757.  Venditto's power and political capital in the Town of Oyster Bay was extraordinary, handily winning re-election by upwards of 70% of the vote. TR 2868,

2918.  No "pushover," Venditto ruled the Town of Oyster Bay as he saw fit, routinely pushing back against favors or demands made by political power brokers, such as Al D'Amato, if the request did not fit within Venditto's agenda for the Town.  TR 2866.

As irrefutably established at trial (and glaringly omitted from the Government's instant Opposition), from 1998-2009, Singh cultivated an extraordinarily close relationship with the Town of Oyster Bay which earned him millions as a Town concessionaire.  Beginning in 1998, the Town rigged a series of concession bids for Singh to ensure his award, and then repeatedly modified the terms of such agreement to stunning lengths.  TR 1884, 3059, 3060, 3064.  For his part, Singh showered town officials with lavish functions, perks, and things of value.

As further established at trial, Singh's symbiotic relationship with the Town of Oyster Bay would continue for years *after* Mangano was elected.  Throughout, the pattern remained the same: when Singh sought an accommodation, he would meet with Genova to present his needs, who would then direct Singh to Mei to draft the requested modified Agreements.  TR 1852, 1891, 2892, 2905, 2915.

As such, from 2010 through 2015, the TOB would continue to rig concession agreements to ensure Singh's award (TR 2562, 2858-59, 2885, 2818, 2920); extend the lengths of existing agreements to upwards of 70 years (TR 3059, 2263); and waive provisions in Singh's agreements which would have allowed the TOB to earn a percentage of Singh's vast revenues, instead allowing Singh to pay grossly below-market rent.  TR 1875-76, 1887.

Singh's sway over the Town was not limited to his Town Concession Agreements; he also raked in $100,000's through his corrupt "expediting business," wherein he accepted money from

20

persons within the Indian-American community to obtain building permits from TOB officials in the Planning Department.  TR 2131, 2159, 2061, 1776, 1778, 1956.

The depth of Singh's nearly two-decade reign in the TOB may be best evidenced by the fact that he and Deputy Town Attorney Fred Mei would come to communicate by untraceable burner phones.  TR 1373, 1791-93, 2041.  It's no wonder that Singh exclaimed, "*God is Great*" upon learning that his cohort, Len Genova, was elevated to the dual role of Deputy Supervisor and Town Attorney in 2010.  TR 2749.  Indeed, from 1998-2015, the Town of Oyster Bay "never said no" to Singh.  TR 2018, 2045.

Perhaps, then, it was understandable that Singh had internal "hopes and expectations" of similar rewards upon Mangano's surprise 2010 election as Executive of a County with a $3 billion budget.  TR 2767, 1954, 2082, 3867.  But, as established at trial, those expectations were not to be realized.  Despite registering his company as a County vendor *three days before* Linda Mangano's first paycheck, Singh would not receive a single one of the lucrative Requirements Contracts which he coveted during the entirety of Mangano's tenure.  TR 2004-2005, 2248, 2082.  For that matter, while hundreds of individuals and companies were awarded under-$25,000 contracts by the Mangano administration – without the need for any legislative approval or oversight – for an endless variety of seemingly non-essential reasons, Singh would receive not a single one during Mangano's tenure.  TR 641, 2083.[3]

Unlike in the Town of Oyster Bay, even Singh's corrupt expediting business "never got off the ground" in Nassau County.  TR 1956-57.  As repeatedly stated by Singh in 2015 to Fred Mei,

---

[3]  In the County, these contracts could be awarded twice annually to an individual or a corporation (TR 641), which could have generated hundreds of thousands of dollars in revenue for Singh.

in the privacy of his Singleton's basement conference room, "I got nothing from Ed Mangano, in fact he cost me money, they even think I got the Town Contract from him!" (a statement which caused the bewildered Fred Mei to respond, "I know that's not true.")  TR 3899.

Yet, in the face of these irrefutable facts, without any support, the Government still baldly asserts that – even without Singh – the evidence of Mangano's guilt in the TOB matter was "overwhelming."  A further drill-down on the testimony of Genova, Sinnreich, and Savino reveals this contention to be preposterous.

2.      *Leonard Genova's Testimony*

Remarkably, Len Genova received immunity to testify as a Government witness.  TR 2820, 2826, 3000, 3073.  The core of his testimony was that he was "overruled" with regard to the TOB's 2010 decision to indirectly back Singh's loans, so as to enable Singh to make capital improvements to Town facilities, claiming at trial that he was "concerned with exposing [TOB] taxpayers."  TR 2789.

Of course, by 2010, Singh had been lavishing benefits on Genova for many years, and, in turn, Genova had become a central figure in rigging lucrative Town bids for Singh; extending the terms of Singh's multiple agreements to impossible lengths and costing Town taxpayers millions by choosing not to collect a percentage of Singh's massive revenues, as permitted under the concession agreements.  TR 2918-20, 2895-96, 2914-16, 3070, 2858, 2905.

At the same time, while acting as both Deputy Town Supervisor and Town Attorney, for years Genova hid from his TOB Financial Disclosure forms $100,000's in fees paid to him by his father, stemming from his father's development of several lucrative real estate complexes located in TOB.  TR 2852-2854.  Genova likewise, failed to report the several millions of dollars he earned

22

after purchasing a large tract of TOB land, evicting its tenants, and then selling the property as "developable" after the last remaining structure was destroyed in a mysterious nighttime blaze and the TOB's corrupt Planning Commission ordered it to be razed.  TR 2948, 2043-44.

And while incredibly testifying as to his concern for "exposing (TOB) taxpayers," it was Genova who, (1) signed the 2011 agreement, indirectly backing Singh's second Madison Loan *after* Fred Mei had slipped a page into the Agreement previously signed by Venditto, changing the loan from $2 million to $3.4 million, and (2) signed – without reading – amendments backing both of the later NDH loans ($7.2 million in 2011, and $12 million in 2012), which unconditionally obligated the TOB to pay upon Singh's default.  TR 2875-76.  It is quite obvious why Singh had a standing order to treat Genova "like a King" (TR 1923; 3029), and why Singh invoked the name of God in exultation upon learning of Genova's elevation in title.  TR 1921.  Additionally, while Genova claimed to be unaware of the operation of Singh's corrupt TOB expediting business, emails revealed this to be false.  TR 2928.

With respect to being "overruled" based upon his concern for TOB taxpayers, at trial, Genova pointed to a 3/23/10 "yellow light" email and a 4/7/10 "red light" email he had received from Jonathan Sinnreich, in which Sinnreich advised against the Town's *direct guaranty* of a loan for Singh.  TR 2973, 2992.

As testified by Genova, this represented to him that the guaranty issue was a "no go," thus, he withdrew from communicating with Singh on the issue.  TR 2781. According to Genova, this changed when John Venditto advised him that Mangano had called to suggest that the TOB contact

the Rivkin firm about trying to find a solution which would permit the Town to help[4], leading to Genova's April 14, 2010 telephone call to Rivkin.  TR 2990.[5]

All of this testimony was transparently false.  The trial record was unequivocal that Genova spent his career extending extraordinary and corrupt accommodations to Singh which cost TOB taxpayers millions.  Moreover, as established at trial, two hours after receiving the March 23rd "yellow light" email, *Genova presided over a TOB Town Board meeting and facilitated the passage of the Resolution authorizing Singh's loan, which at the time was contemplated as a direct guaranty by TOB.*  TR 2849, 2972, 2772-75.  And, on April 8, 2010, the day after receiving the "red light" email, Genova met with Singh and Venditto at Singleton's – *the same day* that Rivkin opened a "New Business Memo" titled "TOB Guaranty." TR 2673, 2982.

Contradicting Genova's testimony, phone records introduced at trial reveal *no calls* between Mangano and Venditto between April 1 – April 13.  TR 3598.  Finally, while Genova claimed that he stopped communicating with Singh after the April 7th "red right email," phone records and emails show that their communications went unabated – including an email *prior* to the April 28th meeting, wherein Singh provided Genova with the names of his closing attorneys for the loan.  TR 2024-2025.

In short, Len Genova's self-serving testimony – which was profoundly suspect, and contradicted by multiple pieces of concrete evidence – hardly provided "overwhelming" proof of

---

[4]   Of course, had such a call been made by Mangano, it would still fall well short of establishing "formal government action."

[5]   Before trial, Genova repeatedly proffered to the Government that Rivkin was called by TOB was because Rivkin was counsel to the Town of Oyster Bay, and because Genova and Venditto had a relationship with Savino.

Mangano's guilt.  Indeed, even if accepted at face value, such testimony sheds *no light* on the central question of the purported understanding which existed between Mangano and Singh.

### 3.   *Jonathan Sinnreich's Testimony*

Nothing in the testimony of Jonathan Sinnreich established Mangano's commission of any of the charged counts.  Essentially, Sinnreich testified that, at the invitation of Fred Mei, he attended the April 28, 2010 meeting at John Venditto's office which involved a discussion concerning Singh's Town Concession Agreement.  According to Sinnreich, while Mangano didn't participate in the meeting, "he contributed *by his presence.*"  TR 2551.  Of course, as unequivocally set forth in *McDonnell v. United States*, 136 S.Ct. 2355 (2016), "attending a meeting or expressing support for a position" are not acts which rise to the level of formal government action.  As the meeting concluded, Sinnreich claimed that Mangano, who had been standing against a wall saying nothing, put his hand on Singh's shoulder and said, to the lawyers, "Let's see if we can help out our friend."  TR 2551.[6]  Of course, as set forth above, this statement (if said) also falls well short of formal government action.

Significantly, Sinnreich also noted that he himself had arrived late to the meeting, and that Mangano arrived upwards of thirty minutes *after Sinnreich*.  TR 2621.  Sinnreich also confirmed that: (1) the meeting was chaired by John Venditto, who sat at the head of the table (TR 2617); (2) the meeting consisted of a discussion among the lawyers to see if there was a legal way to draft an agreement (TR 2619); (3) John Venditto was supportive of reaching a solution (TR 2622); and (4) Venditto gave remarks to open and close the meeting.  TR 2618, 2623.

---

[6]   At trial, Sinnreich conceded that he offered no such testimony in the Grand Jury, wherein he testified simply that, throughout, Mangano stood against a wall and said nothing.  TR 2623. And of course, Singh himself recalled Mangano saying *nothing* during the meeting.

4. _Bill Savino's Testimony_

Bill Savino's testimony centered around GX 423 – a set of handwritten notes made by Savino in April of 2010, and maintained in Rivkin's legal file in the TOB Guaranty Matter. The testimony was strange.  According to Savino, he believes, but is not certain – as he has _no actual recollection_ – that the writing consisted of contemporaneous notes taken during a telephone conversation with Mangano on April 13, 2010, which covered the particulars of Singh's concession agreement with the Town of Oyster Bay.  TR 2701-09.  But a cursory examination of Savino's odd claim revealed it to be, frankly, idiotic.  In fact, Savino's mobile phone records show that he was not even at his desk during his April 13th conversation with Mangano, but actively traveling through New Jersey at the time of the call – making note-taking _a literal impossibility_. TR 3594-3596; 2722-23.

Moreover, the substantive details of the note line-up exactly with a discussion which Savino _did have_ with Len Genova.  Indeed, GX 424 reflected Savino's billing entry of April 14, 2010 regarding a call with Len Genova, which read, "T/C w/Len Genova, outlining relevant facts & addressing certain legal issues presented by license transaction; later s/w Fred Mei as per Len Genova."  TR 2705.

GX 423 – Savino's handwritten notes – were neatly written on a page-long, ruled sheet. It was headed with, "Len Genova," and the writing thereafter contained detailed particulars and relevant facts addressing certain legal issues presented by the transaction.  In fact, Savino conceded that the content of the handwritten notes (GX 423) matched that set forth in Savino's billing entry, reflecting his conversation with Genova (GX 424).  TR 2706.  The handwritten notes contained detailed and sophisticated legal concepts and provisions pertaining to the concession agreement,

of the kind which would be known by the person charged with having negotiated its terms (Len Genova), such as, "license agreement terminable at will," "extended to 2049;" "Tobay willing to value construction;" and "Town willing to buy improvements." TR 2712-2714. The handwritten notes even contained the name and phone number of Deputy Town Attorney Fred Mei, whom Genova directed Savino to call, as reflected in Savino's billing entry, at GX 424. TR 2705.

Further, when challenged with the obvious – that his handwritten notes were made during his April 14th conversation with Genova (as reflected in his billing records) – Savino conceded that:

- It was his custom and practice to take notes of all relevant conversations and maintain them in his legal file. TR 2702-2703.

- It was his custom and practice to identify the name of the person with whom he was speaking on any relevant notes he took. TR 2703.

- It was his custom and practice to bill for any substantive conversations and identify in his billing records the individual with whom he was speaking. TR 2704.

Of course, the only notes produced at the trial were GX 423 – headed with the name "Len Genova" – which perfectly matched his billing entry concerning a conversation with Len Genova. GX 424. No notes were produced from the Rivkin legal file regarding a substantive conversation on the TOB matter with the name "Ed Mangano" (which would have been Savino's custom and practice), and Rivkin's billing records reflect no such conversation as having taken place. TR 2737. In short, Savino's testimony – like Genova's – was highly suspect and riddled with inconsistencies. Such testimony does not come close to constituting "overwhelming evidence."

Most importantly, none of these witnesses – Savino, Sinnreich, or Genova – speak to the central question at trial: whether Edward Mangano's actions in the Town were taken pursuant to a corrupt, *quid-pro-quo* agreement. Only one witness – Harendra Singh – testified to such

27

understanding.   Where Singh has now offered sworn testimony that his purported bribes to Mangano had nothing to do with the Town of Oyster Bay, there is no amount of extraneous testimony capable of filling that glaring evidentiary hole.

Because the Government's single most important witness has reversed his testimony on the single most important issue, Edward Mangano should be granted a new trial.

Dated: Garden City, New York
        June 22, 2020

                                    Respectfully submitted,

                            By: /s/  Kevin J. Keating
                                Kevin J. Keating, Esq.
                                Matthew W. Brissenden, Esq.
                                *Counsel for Edward Mangano*
                                666 Old Country Road, Suite 901
                                Garden City, New York 11530
                                (516) 222-1099